**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

WILLIAM H. CORNING,

                    Plaintiff,

vs.                                                      Case No. 3:08-cv-1171-J-32MCR

LODGENET INTERACTIVE CORPORATION,

                    Defendant.

_____

## ORDER

        Plaintiff, William H. Corning, filed suit against Defendant, LodgeNet Interactive

Corporation, claiming that LodgeNet discriminated against him based on a disability.  This

case is before the Court on LodgeNet's motion for summary judgment. (Doc. 83.) The Court

held a hearing on August 10, 2012, the transcript of which is incorporated herein, and the

Court considers LodgeNet's motion and exhibits and Corning's response and exhibits.

(Docs. 83, 85, 86, 90, 99, 100, 101, 102, 103.)[1]

I.    **Background**

        LodgeNet, a provider of broadband and interactive entertainment for hotels, employed

Corning as a field service technician from August 1, 1996 until his termination on February

15, 2008.  (Docs. 71 at 1-2; 100 at 1.)  Corning was responsible for servicing the twenty-five

to thirty hotels in the Jacksonville area that used LodgeNet's services.  (Doc. 71 at 2.)  On

September 10, 2001, Corning suffered kidney failure, for which he received dialysis until a

_____

        [1]  Although LodgeNet did not request leave of Court in accordance with Local Rule
3.01(c), LodgeNet also filed a Reply to Corning's response in opposition to LodgeNet's
motion for summary judgment (Doc. 105).

kidney transplant in May 2007.  (Id. at 3; Doc. 100 at 1-2.)  Additionally, in 2004, Corning

suffered chronic heart failure and had a defibrillator surgically implanted.  (Doc. 71 at 3.)

Corning alleges that during his 2004 employee review, LodgeNet told him that his

illness and disability was costing LodgeNet too much money; therefore, in January 2005,

Corning received a lesser raise than others.  (Id.; Doc. 100 at 2.)  He claims that in

December 2007, his supervisor, Ron Jackowski, told Corning that his excessive health

insurance claims caused an increase in LodgeNet's insurance premiums and that his kidney

transplant, hospitalization, and three-month FMLA leave cost LodgeNet a "lot of money."

(Doc. 71 at 4.)  The same month, LodgeNet put Corning on a performance improvement plan

after a customer allegedly complained about Corning.  (Id. at 4-5; Docs. 85-1 at 50-51;  90-1

at 1.)

In February 2008, Jackowski showed Corning LodgeNet's new office space, which

Corning contends was a dusty, moldy, storage unit with no heating, air-conditioning,

plumbing, running water, or toilet.  (Docs. 71 at 5-6; 85-2 at 8-10, 15; 103-1 at 20; 103-5 at

54.)   Corning told Jackowski that he could not tolerate those conditions because of

restrictions related to his kidney and compromised immune system.  (Docs. 71 at 6; 85-2 at

9, 13; 103-1 at 21, 36.)  He requested to continue working in the current office location[2] and

asked for an OSHA inspection of the space.  (Docs. 71 at 6; 85-2 at 9; 103-1 at 40; 103-2

at 27, 31.)  Two days later, on February 15, 2008, LodgeNet fired Corning.  (Docs. 71 at 6;

_____

[2]  Although the third amended complaint alleges that Corning requested that LodgeNet
allow him to work from home (Doc. 71 at 6), in his deposition, Corning testified that he did
not make such a request.  (Doc. 85-2 at 22.)

2

103-2 at 27.)

Corning timely filed a charge with the Equal Employment Opportunity Commission, which the EEOC forwarded to the Florida Commission on Human Relations, claiming that LodgeNet discriminated against him based on a disability.  (Doc. 71 at 8-9, 15.)  The EEOC was "unable to conclude that the information obtained establishe[d] violations of the statutes" and issued a Notice of Suit Rights on September 5, 2008.  (Id. at 15.)  Thereafter, on December 4, 2008, Corning filed a complaint against LodgeNet in this Court under the ADA, alleging unlawful employment practices on the basis of disability.  (Doc. 1.)  His third amended complaint also sets forth claims under the Florida Civil Rights Act and the Employee Retirement Income Security Act.  (Doc. 71.)

## II.   **Discussion**

Summary judgment is proper "when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Josendis v. Wall to Wall Residence Repairs, Inc., 662 F.3d 1292, 1314 (11th Cir. 2011); Fed. R. Civ. P. 56(a), (c).  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986).  All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party.  Ramos-Barrientos v. Bland, 661 F.3d 587, 594 (11th Cir. 2011).

**A.    ADA and FCRA Claims**

Counts I and II of Corning's complaint allege discrimination and retaliation under the ADA, respectively, and Counts III and IV allege discrimination and retaliation under the FCRA, respectively.  (Doc. 71 at 7-11.)  LodgeNet contends that it is entitled to summary judgment because (1) Corning is not "disabled" under the ADA and therefore cannot prove a prima facie case of discrimination or retaliation under the ADA or FCRA;[3] and (2) even if Corning was disabled, LodgeNet had legitimate, nondiscriminatory reasons for terminating him.  (Doc. 83 at 10-11.)

1. Discrimination

A plaintiff may prove discrimination through either direct or circumstantial evidence.  Damon v. Fleming Supermarkets of Fla., Inc., 196 F.3d 1354, 1358 (11th Cir. 1999).  "Direct evidence of discrimination is evidence, that, 'if believed, proves [the] existence of [a] fact in issue without inference or presumption.'"  Schoenfeld v. Babbitt, 168 F.3d 1257, 1266 (11th Cir. 1999) (quoting Burrell v. Bd. of Trs. of Ga. Military Coll., 125 F.3d 1390, 1393 (11th Cir. 1997)).  It "is composed of 'only the most blatant remarks, whose intent could be nothing other than to discriminate' on the basis of some impermissible factor."  Id. (quoting Carter v. City of Miami, 870 F.2d 578, 582 (11th Cir. 1989)).  Corning is not relying on such direct evidence of discrimination.

---

[3]  See Greenberg v. Bellsouth Telecomm., Inc., 498 F.3d 1258, 1263-64 (11th Cir. 2007) ("Claims raised under the Florida law are analyzed under the same framework as the ADA."); Downing v. UPS, Inc., 215 F. Supp. 2d 1303, 1308 (M.D. Fla. 2002) ("[C]auses of actions under the FCRA are examined using the same framework as the ADA[.]").

When a plaintiff attempts to prove intentional discrimination using circumstantial evidence, the Court must apply the burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).  Schoenfeld, 168 F.3d at 1267; see Cremeens v. City of Montgomery, Ala., 427 F. App'x 855, 857 (11th Cir. 2011) ("We evaluate ADA discrimination claims under the McDonnell Douglas burden-shifting analysis.").

> Under this framework, the plaintiff has the initial burden of establishing a prima facie case of discrimination.  If he meets that burden, then an inference arises that the challenged action was motivated by a discriminatory intent.  The burden then shifts to the employer to "articulate" a legitimate, non-discriminatory reason for its action.  If the employer successfully articulates such a reason, then the burden shifts back to the plaintiff to show that the proffered reason is really pretext for unlawful discrimination.

Schoenfeld, 168 F.3d at 1267 (internal citations omitted).

To establish a prima facie case of ADA discrimination, Corning must show that he: (1) is  disabled; (2) is a qualified individual; and (3) was subjected to unlawful discrimination because of his disability.  Greenberg, 498 F.3d at 1263;  Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004); Hilburn v. Murata Elecs. N. Am., Inc., 181 F.3d 1220, 1226 (11th Cir. 1999).  The ADA defines a "disability" as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an

5

impairment." 42 U.S.C. § 12102(2) (2008).[4]

> [T]he term "substantially limits" means "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §§ 1630.2(j)(1)(I), (ii) (1997). Major life activities are defined in the regulations as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(I ) (1997). With respect to the major life activity of working, the regulations explain that the term "substantially limits" means "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working." 29 C.F.R. § 1630.2(j)(3)(I) (1997).

Hilburn, 181 F.3d at 1226-27; see Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998) ("[T]he mere existence of a physical impairment does not constitute a disability under the ADA; the impairment must substantially limit a major life activity.").

Corning asserts that he (1) suffers from physical impairments that substantially limit one or more major life activities; (2) has a record of a disability; and (3) was regarded as having a disability. (Doc. 99 at 7-9.) Corning claims that he is disabled under the ADA because he "has been prescribed a variety of immune suppressant medications" that have

---

[4] The conduct relevant to Corning's claims of discrimination occurred in 2008; thus, Corning's claims are properly analyzed under the ADA as it existed prior to January 1, 2009, because the subsequent amendments do not apply retroactively. See Fikes v. Wal-Mart, Inc., 322 F. App'x 882, 883 n.1 (11th Cir. 2009).

significant side effects affecting his daily life.  (Id. at 7; Doc. 100 at 2.)  He further asserts that because his "immune system is weakened, he has been advised to avoid large crowds and moldy or dusty areas."   (Docs. 99 at 7; 85-1 at 39; 85-4 at 16.)  Corning contends that "[t]hese restrictions affect [his] social life [and] his ability to interact with others and prevent him from visiting certain locations." (Doc. 99 at 7.)  Additionally, he alleges that his daily medications cause "nausea and headaches nearly every day, both of which can be severe" and that often, such symptoms render him unable to continue his daily activities because he must lie down to rest until they subside.  (Id.; Doc. 100 at 2.)

Corning asserts that he "has lingering effects of the transplantation."   (Doc. 99 at 7.) He contends that he is unable to stand or sit for long periods of time, thus affecting his work and driving.  (Id.; Doc. 100 at 2.)  He also alleges that he "has been advised to remain in close proximity to his doctors in the event that his body begins to reject his transplanted kidney." (Docs. 99 at 7; 100 at 2.)

In response, LodgeNet contends that at the time of the alleged discrimination, Corning "had both a functioning heart and a functioning (transplanted) kidney . . . ; [t]hus, he did not then suffer from a present physical impairment that substantially limited a major life activity." (Doc. 83 at 13.)  LodgeNet submits that Corning's defibrillator and transplant were mitigating measures that corrected his conditions such that when LodgeNet terminated him, he was not impaired.  (Id. at 14.)  Even if Corning was impaired, LodgeNet contends that he was not disabled because he was not substantially limited in a major life activity.  (Id.)  LodgeNet asserts that Corning fails to identify a major life activity in which he was substantially limited, and "there is no evidence whatsoever demonstrating that [Corning's] ability to perform any

7

major life activity was substantially limited at the time of the alleged discrimination." (Id. at 15.)

When considering whether an individual is substantially limited in a major life activity, corrective and mitigating measures should be considered, because the ADA requires that individuals be presently disabled – not potentially or hypothetically disabled. Sutton v. United Air Lines, Inc., 527 U.S. 471, 482 (1999); Collado v. UPS, Inc., 419 F.3d 1143, 1156 (11th Cir. 2005). Corning received a kidney transplant and a defibrillator and is taking medication for his health conditions, and he has presented no evidence disputing the contention that these measures have allowed him to function normally. Therefore, Corning is evaluated in terms of an individual who has a properly functioning kidney and heart as a result of his medical procedures and medications.

In Sutton, the Supreme Court stated:

> A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently "substantially limits" a major life activity. To be sure, a person whose physical or mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is corrected it does not "substantially limi[t]" a major life activity.

527 U.S. at 482-83; see Greenberg, 498 F. 3d at 1264. Therefore, although Corning had an impairment at the time of his termination, because mitigating measures corrected his impairment, he did not have a physical impairment that substantially limited a major life activity. See Darwin v. Principi, No. 6:04-cv-347-Orl-31DAB, 2006 WL 5079473, at *7 (M.D. Fla. June 15, 2006) ("Because Plaintiff's hearing impairment was corrected initially with the amplification box . . . and later with surgery and effective hearing aids . . . (during the relevant

8

time period), her hearing impairment did not limit a major life activity . . . [and] did not qualify as a disability."); Campbell v. Prince George Cnty. Md., No. Civ. A. AW-99-870, 2001 WL 21257, at *4 (D. Md. Jan. 4, 2001) ("Because Plaintiff's liver functions normally while she is on medication, Plaintiff currently does not have a physical impairment that substantially limits one or more major life activities."); Jewell v. Reid's Confectionary Co., 172 F. Supp. 2d 212, 216-17 (D. Me. 2001) ("Because Plaintiff alleges that he fully recovered from his heart attacks with the help of an internal defibrillator, the Court rejects his claim that his heart condition was substantially limiting and that he was actually disabled.").

In spite of his mitigating measures, Corning insists he is limited in major life activities as set forth above.  In Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184, 197  (2002), the Supreme Court held that major life activities are "those activities that are of central importance to daily life."  Although Corning alleges that he must avoid large crowds and moldy or dusty areas, thus limiting his social life and preventing him from visiting certain locations, he has not shown how this equates to a substantial limitation on a major life activity.  Similarly, Corning has not shown how the alleged necessity of resting until his nausea and headaches subside is a limitation of a major life activity.

In his deposition, Corning testified that as of December 2007, he had resumed coaching ice hockey and that by February 2008, he was lifting greater than ten pounds and climbing stairs regularly; however, he could not do yard work because he could not breathe in particles of dust or moisture.  (Doc. 85-2 at 14, 18; see also Doc. 85-1 at 46.)  Further, Corning's discharge instructions and "self-care tips" provided some restrictions on Corning's activities; however, Corning admitted in his deposition that by February 2008, he was no

9

longer heeding many such instructions/tips. (See Doc. 85-2 at 13-14.)  Even if, viewing the facts in the light most favorable to Corning, he has shown some limitations on his activities, he has not shown a substantial limitation of a major life activity.  See Cash v. Smith, 231 F.3d 1301,1305 (11th Cir. 2000) ("Cash has exhaustively chronicled her many health problems and enumerated their symptoms, but she has failed to specify a major life activity in which she is substantially limited, nor has she provided any evidence of such a limitation."); Reis v. Universal City Dev. Partners, Ltd., 442 F. Supp. 2d 1238, 1245 (M.D. Fla. 2006) (stating that "courts have consistently held that an individual who functions only moderately below average is not substantially limited" and that "[a] diminished activity tolerance for normal daily activities such as lifting, running and performing manual tasks, as well as a lifting restriction, does not constitute a disability under the ADA") (internal quotations omitted).

Additionally, Corning contends that he is unable to stand or sit for long periods of time,[5] which affects his work and driving, and that he "has been advised to remain in close proximity to his doctors in the event that his body begins to reject his transplanted kidney." (Doc. 99 at 7.)  Again, Corning fails to show a substantial limitation of a major life activity. After Corning's kidney transplant, his physician noted on LodgeNet's fitness for duty certification that Corning could return to work on June 25, 2007 (more than seven months before he was terminated) with no restrictions other than that he was not to climb or lift 110 pounds.  (Docs. 85-1 at 38, 85-3 at 50.)  Corning testified that once he returned to work, he

---

[5]  See Darwin, 2006 WL 5079473, at *8 ("The appellate courts have generally held that the inability to stand, or to take breaks from standing, does not make a condition disabling.") (citing Rossbach v. City of Miami, 371 F.3d 1354, 1357 (11th Cir. 2004) as well as cases from the Second, Third, and Fifth Circuits).

was working forty-hour weeks, even though he did not return "full strength."  (Doc. 85-1 at 31.)  Additionally, he testified that he had long been driving a vehicle by February 2008. (Doc. 85-2 at 14.)

Further, regarding the major life activity of working, for Corning to show that he was substantially limited in this respect, he must show that he was "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities[,]" because "[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working."  See Hilburn, 181 F.3d at 1226-27; see also Standard, 161 F.3d at 1327.  Here, Corning fails to show that he is significantly limited in a class of jobs or a broad range of jobs in various classes.  Instead, the facts show that Corning's kidney failure occurred in 2001 with a transplant in 2007, and his heart failure occurred in 2004 with a defibrillator implanted the same year; yet, with limited exceptions, he was able to perform his job with little to no restrictions during that entire period up to his termination.  See McCoy v. Geico Gen. Ins. Co., 510 F. Supp. 2d 739, 750 (M.D. Fla. 2007) ("Plaintiff's deposition testimony and ability to hold a job for four years with Defendant belie any claim that he cannot perform a broad range or class of jobs.") (internal quotation omitted); Moore v. Hillsborough Cnty. Bd. of Comm'rs, 544 F. Supp. 2d 1291, 1301 (M.D. Fla. 2008) ("Plaintiff's testimony that her injuries did not prevent her from performing her job, along with her ability to hold a job with Defendant for several years following her injuries and subsequent employment . . . , indicate that she was not substantially limited from a class or broad range of jobs."); Roush v. Weastec, Inc., 96 F.3d 840, 844 (6th Cir. 1996) ("Although plaintiff

11

underwent a number of surgeries and medical procedures to correct her condition and her ability to work was substantially limited during that period, this does not necessarily lead to the conclusion that plaintiff presently has a disability.  Instead, . . . plaintiff's kidney is no longer obstructed and no longer affects her ability to work.").  Thus, even if Corning has shown that he has an impairment, Corning fails to show that he is significantly limited in a major life activity.  See Standard, 161 F.3d at 1327 ("Merely proving the existence of a physical impairment, without addressing any limitation on major life activities, is not sufficient . . . .").

Corning also claims that "[t]he evidence demonstrates a record of Corning's disability and impairment during his LodgeNet tenure."  (Doc. 99 at 8.)  He asserts that LodgeNet employees were aware of his "disability," and specifically, that Jackowski testified in his deposition "that he was aware that Corning had kidney failures and his health was frequently discussed."  (Id. at 8-9.)  Additionally, Corning points to Caroline Zix's testimony "that LodgeNet maintained a FMLA file for Corning and that she was aware that he made one or more FMLA claims."  (Id. at 9.)

LodgeNet counters that "there is no evidence that [it] relied upon a record which either classified or misclassified [Corning] as having a physical or mental impairment that substantially limits a major life activity, such that [Corning] could establish a viable 'record of' claim."  (Doc. 105 at 5 (internal quotation omitted).)  LodgeNet contends that Jackowski's knowledge that Corning had kidney failure in the past, or a human resources representative's awareness of Corning's FMLA leave, "does not establish that LodgeNet 'relied upon' any records of [Corning]'s alleged disability."  (Id.)  Thus, LodgeNet asserts that Corning fails to

establish that he had a record of disability.  (Id.)

The relevant regulation provides that one has a record of disability if that person "has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities."  29 C.F.R. § 1630.2 (k).  In accordance with the above analysis regarding whether Corning had an actual disability (i.e. an impairment substantially limiting a major life activity), Corning did not have a history of having an impairment that substantially limited a major life activity.  See Hilburn, 181 F.3d at 1229 ("Regardless of whether Hilburn is proceeding under a classification or misclassification theory, the record-of-impairment standard is satisfied only if she actually suffered a physical impairment that substantially limited one or more of her major life activities.").  Additionally, neither Jackowski's knowledge of Corning's health conditions nor human resources employees' awareness of, or maintaining a file pertaining to, Corning's FMLA leave establishes that Corning had a record of disability.  See Shepard v. UPS, Inc., 470 F. App'x 726, 2012 WL 833369, at *3 (11th Cir. Mar. 14, 2012) ("Shepard cannot demonstrate that he had a record of having an impairment based solely on his prior medical leaves of absence and testimony that it was common knowledge at UPS that he had leukemia, because he failed also to produce evidence that his impairment substantially limited him in a major life activity."); Reis, 442 F. Supp. 2d at 1248-49 (holding that evidence of discussions with a supervisor regarding a health condition, submission of various doctors' notes to a former supervisor, hospitalization, and the occurrence of several telephone calls reporting her hospitalization was insufficient to show a "record of" disability because the plaintiff failed to demonstrate that her impairment substantially limited a major life activity); Coleman v. Ga.

Power Co., 81 F. Supp. 2d 1365, 1370 (N.D. Ga. 2000) ("Nothing in the record indicates that GPC was aware that Plaintiff had a history of being substantially limited in any major life activity . . . [; t]herefore, . . . Plaintiff has failed to discharge his burden of establishing that he is disabled[.]"). Thus, Corning "ha[s] not furnished any evidence that [LodgeNet] had any record of a mental or physical impairment which substantially limited one or more of [his] major life activities." See Hilburn, 181 F.3d at 1229.

Further, Corning contends that LodgeNet regarded him as having a disability. (Doc. 99 at 9.) He asserts that irrespective of whether he was actually disabled, "his health condition, documented FMLA leave, work absences, and frequent discussions of his health and major surgeries show that LodgeNet considered him to be substantially impaired." (Id.)

In response, LodgeNet argues that:

> Plaintiff has presented no evidence to demonstrate that LodgeNet regarded him as substantially limited in any major life activity, nor has he cited any case law or other authority to support his position. . . . Plaintiff alleges that LodgeNet must have regarded him as substantially impaired because of his "documented FMLA leave, work absences, and frequent discussions of his health and major surgeries." Put simply, Plaintiff attempts to use LodgeNet's compliance with its legal obligations to argue that LodgeNet regarded him as disabled. If this argument were accepted, every employer who fulfills its duty to provide an eligible employee with FMLA leave or that accommodates an employee's medical restriction would be deemed to have regarded that employee as disabled. This cannot be the meaning of the ADA.

(Doc. 105 at 6 (internal citation omitted).)

To establish that LodgeNet regarded him as disabled, Corning must show that LodgeNet perceived him as being substantially limited in a major life activity, regardless of whether he had an actual impairment or not. See 29 C.F.R. § 1630.2(l); Hilburn, 181 F.3d

14

at 1230.  "The mere fact that an employer is aware of an impairment is not sufficient to show that the employer regarded the employee as disabled or that the perception caused an adverse employment action."  Jenks v. Naples Comty. Hosp., Inc., No. 2:10-cv-197-FtM-DNF, 2011 WL 5357624, at *13 (M.D. Fla. Nov. 7, 2011); Coleman, 81 F. Supp. 2d at 1370 ("Plaintiff . . . argues . . . that he was perceived as disabled because Defendant was aware of his obesity.  This is not enough. . . .  Plaintiff must demonstrate . . . that [Defendant] regarded him as substantially limited in a major life activity.").  Viewing the evidence in the light most favorable to Corning, he has not established that LodgeNet treated him as if he suffered from a substantially limiting impairment or perceived him as such.  See Jenks, 2011 WL 5357624, at *13 ("Defendants and all the employees involved knew that Ms. Olsen had cancer, but that recognition is not enough to show that the Defendants believed she was limited in a major life activity.").  Thus, Corning fails to establish that LodgeNet regarded him as disabled.  Absent showing that he had a disability,[6] Corning fails to satisfy the prima facie case.[7]  Therefore, his claims under the ADA and FCRA fail.

However, even if Corning had satisfied his prima facie case, LodgeNet articulated a

_____

[6] Because Corning was not disabled within the meaning of the ADA, any claim for failure to accommodate necessarily fails, because the existence of a disability is a prerequisite to entitlement to a reasonable accommodation.  See Albright v. Columbia Cnty. Bd. of Educ., 135 F. App'x 344, 346 (11th Cir. 2005) ("Because we conclude that Albright is not disabled within the meaning of the ADA, the Board also was not required to accommodate her."); McKane v. UBS Fin. Servs., Inc., 363 F. App'x 679, 681 (11th Cir. 2010) (discussing the prima facie case for failure to accommodate, including the plaintiff's burden to show that he or she is disabled); Darwin, 2006 WL 5079473, at *13 (same).

[7] Because Corning fails to show that he was disabled at the time of his termination, the Court need not address the remaining elements of the prima facie case.

15

legitimate, nondiscriminatory reason for terminating Corning.  "In general, the employer has an 'exceedingly light burden' in setting forth legitimate, non-discriminatory reasons for termination." Woodbury v. Sears, Roebuck, & Co., 901 F. Supp. 1560, 1563 (M.D. Fla. 1995) (quoting Perryman v. Johnson Prods., Co., 698 F.2d 1138, 1142 (11th Cir. 1983)); Moore, 544 F. Supp. 2d at 1307 ("Defendant's burden of articulating legitimate reasons 'is exceedingly light; the defendant must merely proffer [legitimate] reasons, not prove them.'") (quoting Meeks v. Computer Assocs. Int'l, 15 F.3d 1013, 1019 (11th Cir. 1994)).  "The defendant need not persuade the court that it was actually motivated by the proffered reasons.  It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." Tex. Dep't of Cmty. Affairs, 450 U.S. at 254-55 (internal citation omitted); see Cleveland, 369 F.3d at 1193.  LodgeNet has produced evidence that Corning had multiple job performance issues including insubordination toward his supervisor, a threat to a coworker, at least one customer complaint, and sexual harassment of a coworker.  (Docs. 85-1 at 41, 44, 46, 49-50; 85-2 at 5-8; 85-4 at 42-45; 85-6 at 8-12, 17-23; 90-2 at 22, 28-29, 34-35, 40; 90-4 at 38; 90-5 at 6-7, 27-29; 103-1 at 8-9, 12, 21-23, 28, 33-34, 39, 115-16; 103-2 at 7-11, 16-23, 31; 103-5 at 64-66; 103-6 at 7-8,10.)  By producing evidence demonstrating Corning's job performance issues, LodgeNet articulated a legitimate, nondiscriminatory reason for its actions.  See McCoy, 510 F. Supp. 2d at 752 ("Defendant has adequately met its burden by alleging, with supporting documentation, that Plaintiff's repeated violations of company policies were the legitimate, non-discriminatory reason[s] for his termination.").

The burden therefore shifts back to Corning to show that LodgeNet's reason for

16

terminating him was merely pretextual.  See Jenks, 2011 WL 5357624, at *10 ("If the employer shows a nondiscriminatory reason or reasons, then the plaintiff must proffer sufficient evidence to create a genuine issue of material fact as to whether each of the defendant's proffered reasons is pretextual.") (internal quotations omitted).  "Pretext is only proven if 'it is shown both that the reason was false, and that discrimination was the real reason behind the challenged action.'" Daugherty v. Mikart, Inc., 205 F. App'x 826, 827 (11th Cir. 2006) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)); Selkow v. 7-Eleven, Inc., No. 8:11-cv-456-T-33EAJ, 2012 WL 2054872, at *10 (M.D. Fla. June 7, 2012); see also Schoenfeld, 168 F.3d at 1269 ("A plaintiff may show pretext and survive summary judgment by presenting evidence sufficient to demonstrate a genuine issue of material fact as to the truth or falsity of the employer's legitimate, nondiscriminatory reasons.") (internal quotation omitted); Tex. Dep't of Cmty. Affairs, 450 U.S. at 256.  The plaintiff must point to "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." Silvera v. Orange Cnty. Sch. Bd., 244 F.3d 1253, 1258 (11th Cir. 2001) (internal quotation omitted); see Cleveland, 369 F.3d at 1193; Jenks, 2011 WL 5357624, at * 11 (stating that the plaintiff must "show that the reasons were false, and that discrimination was the real reason").

In Chapman v. A1 Transport, the Eleventh Circuit cautioned:

> A plaintiff is not allowed to recast an employer's proffered
> nondiscriminatory reasons or substitute his business judgment
> for that of the employer.  Provided that the proffered reason is
> one that might motivate a reasonable employer, an employee
> must meet that reason head on and rebut it, and the employee

17

> cannot succeed by simply quarreling with the wisdom of that reason.

229 F.3d 1012, 1030 (11th Cir. 2000); see Selkow, 2012 WL 2054872, at *11 ("We do not analyze whether employment decisions are prudent or fair[; i]nstead, our sole concern is whether unlawful discriminatory animus motivates a challenged employment decision.") (internal quotations omitted). "An employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Fratarcangeli v. UPS, No. 8:04-cv-2812-R-TGW, 2008 WL 821946, at *6 (M.D. Fla. Mar. 26, 2008) (internal quotation omitted); see Daugherty, 205 F. App'x at 827 ("[A]n employer may fire an employee based upon erroneous facts, as long as it is not for a discriminatory reason."); Selkow, 2012 WL 2054872, at *12 ("A termination based on a good faith belief of misconduct is legitimate, even if it is later determined that no misconduct occurred.").

Corning asserts that for the jury to determine that "LodgeNet's termination decision was based on legitimate non-pretextual reasons, . . . it will have to conclude that, after 11 years of stellar performance and reviews, Corning suddenly became a bad employee." (Doc. 99 at 1-2.)  Corning submits that the only review that was not stellar was given a month before his termination.  (Id. at 2.; see Docs. 85-2 at 2; 103-1 at 23-27, 83-105; 103-2 at 25.) He alleges that "other than recent claimed concerns about Corning's performance, he was improving and on a positive track up to the moment he complained about the plan to move him to a storage shed." (Docs. 99 at 4; 103-1 at 83-105.)

Additionally, Corning states that "other employees, including his direct supervisor,

complained about the impact that his health conditions had on their insurance premiums." (Docs. 99 at 3; 100 at 2; 85-2 at 23-24.)  Corning contends that "because of hospitalizations and FMLA leave, [he] received a lesser raise than other similarly situated employees in 2005 . . . and in 2008."  (Docs. 99 at 3; 100 at 2; 85-1 at 37-38; 85-2 at 17; 85-6 at 6, 38, 44; 90-2 at 40; 103-1 at 39, 111-12; 103-2 at 5.)  Further, Corning points to the close temporal proximity – two days – between his request at the storage shed and his termination.  (Doc. 99 at 12.)

Viewing the facts in the light most favorable to Corning, he has not presented any evidence that those at LodgeNet involved in the decision to terminate him did not honestly believe that Corning's job performance issues occurred.  See Fratarcangeli, 2008 WL 821946, at *17; Moore, 544 F. Supp. 2d at 1303 ("[A]side from her bare contention, Plaintiff provides no evidence that Defendant knew that the allegations were false or that the reasons for her termination were pretextual.").  Although the facts establish that Corning was a long-term employee who received favorable evaluations until about one month prior to his termination, the evidence also demonstrates that in a relatively short period leading up to Corning's termination, LodgeNet believed that he committed a series of infractions that culminated in its decision to terminate him.  Further, despite the temporal proximity between the storage shed incident and Corning's termination, the evidence shows that LodgeNet's perception of Corning's behavior toward his supervisor during that meeting as inappropriate and unacceptable was one of various considerations in the termination decision.

Accordingly, none of the evidence Corning cites reasonably leads to the conclusion that LodgeNet's reasons for terminating him are false, and he has no probative evidence that

the performance issues did not motivate the termination decision.  See Fratarcangeli, 2008 WL 821946, at *17.[8]   Corning "does not present any evidence that demonstrates weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [LodgeNet]'s proffered reason[s]."  See Reis, 442 F. Supp. 2d at 1255.  Thus, Corning fails to present evidence showing a genuine issue as to whether LodgeNet's stated reason for not hiring him was pretextual.

### 2. Retaliation

The ADA prohibits retaliation against an individual because that person has opposed any act or practice made unlawful by the Act.  42 U.S.C. § 12203(a); Moore, 544 F. Supp. 2d at 1305.  To establish a prima facie case of retaliation under the ADA, Corning must show that: (1) he engaged in conduct protected by the ADA; (2) he suffered an adverse employment action; and (3) the adverse employment action was causally related to the protected conduct.  Moore, 544 F. Supp. 2d at 1305; Collado, 419 F.3d at 1158; Farley v. Nationwide Mut. Ins. Co., 197 F.3d 1322, 1336 (11th Cir. 1999).[9]   "The causal link is

_____

[8] Although Corning points to an alleged inconsistency between LodgeNet's corporate representative John Haar's testimony that one of the reasons for terminating Corning was Kathryn Frierson's harassment allegation and Frierson's testimony "that it had nothing to do with her sexual harassment letter" as well as LodgeNet Senior Human Resources Generalist Caroline Zix's testimony "that Corning's termination . . . did not rest on" Frierson's complaint (Doc. 99 at 4-5), there is no inconsistency between Haar and Zix's testimony, and Frierson's alleged understanding of LodgeNet's reasons for terminating Corning is not relevant, and even if it was, it does not demonstrate pretext.  (See Docs. 103-2 at 9, 19-20; 103-5 at 14; 103-6 at 8.)

[9] "To recover for retaliation, 'the plaintiff need not prove the underlying claim of discrimination which led to h[is] protest, so long as []he had a reasonable good faith belief that the discrimination existed.'"  Branscomb v. Sec'y of the Navy, 461 F. App'x 901, 906 (11th Cir. 2012) (quoting Meeks, 15 F.3d at 1021).  Thus, a plaintiff need not be "disabled"

construed broadly, so that a plaintiff 'merely has to prove that the protected activity and the

adverse action are not completely unrelated.'" Fratarcangeli, 2008 WL 821946, at *6 (quoting

Higdon v. Jackson, 393 F.3d 1211, 1219 (11th Cir. 2004)); Moore, 544 F. Supp. 2d at 1306.

"A causal connection is likely to be found where there is a 'close temporal proximity' between

the time an employer learns about protected activity and the adverse employment action."

Moore, 544 F. Supp. 2d at 1306 (quoting Farley, 197 F.3d at 1337).

      LodgeNet claims that Corning "cannot meet a single element of this claim." (Doc.

83 at 21.)  LodgeNet contends that because Corning was not disabled, he did not have a

protected right to seek a reasonable accommodation. (Id.)  Regardless, LodgeNet asserts

that Corning "admitted definitively and repeatedly that he did not make a request for

accommodation while employed at LodgeNet." (Id. at 20.)  LodgeNet contends that because

it "could not retaliate against [Corning] for a request he did not make, his retaliation claims

fail as a matter of law."  (Id.)  Additionally, "while LodgeNet concedes that [Corning's]

discharge was an adverse employment action," it alleges that the termination did not follow

protected conduct.  (Id. at 21.)  Further, LodgeNet argues that "because there was no

protected conduct, there could be no causal link between protected conduct and [Corning]'s

termination." (Id.)

---

or a "qualified individual" as defined by the ADA to succeed on a retaliation claim.  See id.
(finding that the trial court erred in granting summary judgment on the retaliation claim
because – without mentioning the retaliation claim – the trial court granted summary
judgment on the plaintiff's disability discrimination claims "because he was not a 'disabled
person' or a 'qualified individual[;]'" however, the Eleventh Circuit held that "[t]his
determination was not dispositive of [the] retaliation claim, which required only a reasonable
belief that the Navy had violated the statutes").

Corning counters that he "did, in fact, request an accommodation from LodgeNet during his discussion with Jackowski at the storage shed on February 13, 2008." (Doc. 99 at 11.) He alleges that during that conversation, he indicated to Jackowski that he would get sick if LodgeNet forced him to work in the storage shed and requested an OSHA inspection of the shed. (Id.; Docs. 103-1 at 21, 36, 40; 103-2 at 27, 31.) Corning also asserts that he showed Jackowski a medic alert card, which indicated his disability. (Docs. 99 at 11; 103-1 at 43.) He submits that "[t]he record is replete with evidence that Corning acted in good faith in requesting the accommodation based on an objectively reasonable belief that he was entitled to an accommodation due to his disability and health impairment." (Doc. 99 at 11.)

Corning also alleges that he suffered an adverse employment action – termination – "a day or two later." (Id.; Doc. 103-1 at 41.) He asserts that the close temporal proximity between LodgeNet's knowledge of his protected conduct and his termination establishes the requisite causal link. (Doc. 99 at 11-12.) Thus, Corning contends that he has satisfied the prima facie case and "LodgeNet should not be granted summary judgment on [his] retaliation claims as there are genuine issues of material fact which should be submitted to a jury." (Id. at 12.) For purposes of this analysis, the Court assumes that Corning has established a prima facie case.[10]

_____

[10] In any event, Corning likely makes out a prima facie case because viewing the facts in the light most favorable to him, (1) he engaged in protected activity when he requested an accommodation including to not work out of the storage shed; (2) he suffered an adverse employment action when LodgeNet terminated him; and (3) given that there were only two days between the request and his termination, Corning shows that the adverse action was causally related to the protected conduct. See Farley, 197 F.3d at 1337 ("[A] plaintiff satisfies [the causal connection] element if he provides sufficient evidence that the decision-maker became aware of the protected conduct, and that there was close temporal proximity

Once Corning establishes a prima facie case, the burden shifts to LodgeNet to rebut the presumption of retaliation by articulating a legitimate, non-retaliatory reason for the challenged employment decision. Farley, 197 F.3d at 1336; Fratarcangeli, 2008 WL 821946, at *6; Jenks, 2011 WL 5357624, at *14. As stated above, by producing evidence of Corning's job performance issues, LodgeNet articulated a legitimate, non-retaliatory reason for its actions. (See Docs. 85-1 at 41, 44, 46, 49-50; 85-2 at 5-8; 85-4 at 42-45; 85-6 at 8-12, 17-23; 90-2 at 22, 28-29, 34-35, 40; 90-4 at 38; 90-5 at 6-7, 27-29; 103-1 at 8-9, 12, 21-23, 28, 33-34, 39, 115-16; 103-2 at 7-11, 16-23, 31; 103-5 at 64-66; 103-6 at 7-8,10.) Thus, the presumption of retaliation drops from the case, and it is Corning's burden to offer evidence from which a jury could conclude that this reason was a "pretextual ruse for retaliation." Farley, 197 F.3d at 1337 (internal quotation omitted); see Fratarcangeli, 2008 WL 821946, at *6 (stating that the plaintiff has the "burden to 'present significant probative evidence' that the reasons offered by the employer were a pretext for retaliation" (quoting Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)).

As stated above, Corning's evidence of pretext includes the close temporal proximity between the incident at the storage shed and his termination. (Docs. 99 at 12.) "While the close temporal proximity between [LodgeNet]'s termination of [Corning]'s employment and his [request for accommodation] is evidence of pretext, it may be insufficient

---

between this awareness and the adverse employment action."); Reis, 442 F. Supp. 2d at 1254 (same); but see Jenks, 2011 WL 5357624, at *14 ("Close temporal proximity between the protected conduct and the adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact as to the causal connection, however this alone may not be sufficient to establish pretext.").

to show pretext by itself." <u>Daugherty</u>, 205 F. App'x at 828.  Although the Court recognizes the potential significance of the mere two-day separation between Corning's request to Jackowski and his termination, this fact is not dispositive of pretext.  Corning's termination two days after his discussion with Jackowski at the storage shed does not undercut LodgeNet's stated reasons for the termination.  <u>Daugherty</u>, 205 F. App'x at 828.

Corning "needed to present other evidence supporting his claim that [LodgeNet]'s stated reason for terminating him was pretextual." <u>Id.</u>  His additional evidence of pretext includes: (1) "stellar" reviews up until a month prior to his termination; (2) his improvement and the "positive track" he was on prior to his complaint about the storage shed; (3) complaints about the impact his conditions had on insurance premiums; and (4) his lesser raises in 2005 and 2008 relative to other similarly-situated employees. (<u>See</u> Docs. 85-1 at 37-38; 85-2 at 2, 17, 23-24; 85-6 at 6, 38, 44; 90-2 at 25-27, 40; 100 at 2; 103-1 at 23-27, 39, 83-105, 111-12; 103-2 at 5, 25, 31.)    As explained in more detail above, Corning fails to show that LodgeNet's reasons for his termination were pretextual because he has not shown either that the reasons given were false, or that discrimination was the real reason. <u>See</u> <u>Daugherty</u>, 205 F. App'x at 828-29; <u>Fratarcangeli</u>, 2008 WL 821946, at *16.  Accordingly, summary judgment is appropriate on Corning's retaliation claims.

**B.       ERISA Claim**

Count V of Corning's complaint alleges that LodgeNet violated ERISA by terminating him "in substantial part because his illness caused the premiums under his health plan through [LodgeNet] to increase[.]".  (Doc. 71 at 12.)  LodgeNet contends it is entitled to summary judgment because (1) Corning cannot demonstrate that LodgeNet terminated him

with the specific intent to interfere with his ERISA benefits, and (2) Corning did not exhaust his administrative remedies. (Doc. 83 at 11.) In response, Corning argues that "following his kidney transplant, other employees, including his direct supervisor, complained about the impact his health conditions had on their insurance premiums," and that "[t]his, along with other record evidence, presents sufficient facts whereby the fact-finder could reasonably find that the cost of Corning's health benefits was at least a factor, and potentially the deciding factor, in the decision to terminate him." (Doc. 99 at 13-14.) Additionally, Corning asserts that the exhaustion requirement should be excused because resort to administrative remedies would have been futile. (Id. at 12-13.)

Section 510 of ERISA provides, in pertinent part:

> It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan, . . . or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan . . . .

29 U.S.C. § 1140; see Krebs v. Aviation Constructors, Inc., 179 F. App'x 627, 628 (11th Cir. 2006) ("ERISA forbids termination of an employee for the purpose of depriving him of ERISA-covered benefits."). To survive summary judgment, a plaintiff bringing a cause of action under § 510 must show that the employer had the specific intent to interfere with the plaintiff's right to benefits. Krebs, 179 F. App'x at 628; Gitlitz v. Compagnie Nationale Air Fr., 129 F.3d 554, 558 (11th Cir. 1997) ("The ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights.") (internal quotation omitted); Reynolds v. Int'l Bus. Machs. Corp., 320 F. Supp. 2d 1290, 1299 (M.D.

Fla. 2004).  Although Corning is not required to prove that interference with ERISA rights was LodgeNet's sole reason for his termination, he must show more than the incidental loss of benefits.  See Gitlitz, 129 F.3d at 558; Reynolds, 320 F. Supp. 2d at 1299; Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1492 (11th Cir. 1993) ("Because the evidence offered by Daughtrey shows only the incidental loss of benefits as a result of discharge, the district court properly granted summary judgment[.]") (internal quotation omitted).  He can meet this burden either by showing direct proof of discrimination or by satisfying the McDonnell Douglas burden-shifting framework for circumstantial evidence.  Gitlitz, 129 F.3d at 558-59; Mundale v. Lockheed Martin Corp., No. 8:08-cv-217-T-24-TBM, 2009 WL 179632, at *3 (M.D. Fla. Jan. 26, 2009).  Because Corning has not produced direct proof of discrimination, he must satisfy McDonnell Douglas.

.       In Gitlitz, the Eleventh Circuit stated:

> "In the context of a § 510 claim alleging unlawful discharge, a plaintiff may establish a prima facie case of discrimination by showing (1) that he is entitled to ERISA's protection, (2) was qualified for the position, and (3) was discharged under circumstances that give rise to an inference of discrimination. . . . . To satisfy the last element the plaintiff does not have to prove discriminatory intent but must introduce evidence that suggests interference with ERISA rights was a motivating factor. . . . The plaintiff, however, cannot establish a prima facie case merely by showing that, as a result of the termination, he was deprived of the opportunity to accrue more benefits. . . . Instead the employee must introduce evidence suggesting that the employer's decision was directed at ERISA rights in particular."

29 F.3d at 559 (quoting Clark v. Coats & Clark, 990 F.2d 1217, 1223-24 (11th Cir. 1993)).

LodgeNet asserts that Corning fails to satisfy the prima facie case because he "has

26

not created a material question of fact regarding whether his termination gives rise to an inference of discrimination." However, for the purposes of summary judgment analysis, the Court assumes that Corning has satisfied the prima facie case.[11] Thus, because LodgeNet has articulated a legitimate, nondiscriminatory reason for Corning's termination (See Docs. 85-1 at 41, 44, 46, 49-50; 85-2 at 5-8; 85-4 at 42-45; 85-6 at 8-12, 17-23; 90-2 at 22, 28-29, 34-35, 40; 90-4 at 38; 90-5 at 6-7, 27-29; 103-1 at 8-9, 12, 21-23, 28, 33-34, 39, 115-16; 103-2 at 7-11, 16-23, 31; 103-5 at 64-66; 103-6 at 7-8,10), Corning must "come forward with evidence . . . sufficient to permit a reasonable factfinder to conclude that the reasons given by [LodgeNet] were not the real reasons for [Corning's termination]." Chapman, 229 F.3d at 1024; Mundale, 2009 WL 179632, at *3 (stating that once the ERISA prima facie case is met and the defendant produces a legitimate, nondiscriminatory reason for the alleged discrimination, "the plaintiff must then prove that the legitimate reason was a mere pretext for discrimination").

Corning submits evidence that other employees, including Jackowski, allegedly complained about the impact his conditions had on insurance premiums; that he received lesser raises in 2005 and 2008 relative to other similarly-situated employees; and that he had "stellar" reviews until a month prior to his termination, was improving, and was on a "positive track." (See Docs. 85-1 at 37-38; 85-2 at 2, 17, 23-24; 85-6 at 6, 38, 44; 90-2 at 25-27; 100 at 2; 103-1 at 23-27, 39, 83-105, 111-12; 103-2 at 5, 25, 31.) However, the undisputed facts show that LodgeNet knew of Corning's conditions for several years before his termination,

---

[11] "The burden of establishing a prima facie case is not onerous." Clark, 990 F.2d at 1223.

27

coordinated with him to ensure that he received medical leave, paid for all of his medical claims without incident, including those for his kidney transplant, and took no action in the interim to deprive Corning of any benefits.[12]  (See, e.g., Docs. 85-1 at 31-32; 85-3 at 41, 43; 103-1 at 15.)  Further, despite the temporal proximity between the storage shed incident and Corning's termination, there is no suggestion that his use of benefits increased just prior to his termination.

In Arnett v. Tuthill Corporation, 849 F. Supp. 654, 663-64 (N.D. Ind. 1994), the court stated:

> Any inference to be drawn from the rapidity and proximity in this case is negated by the other facts and circumstances present in the record.  First, Fill–Rite learned [of] Arnett['s condition] in November 1989, when she told Jenkins and Wright about her diagnosis.  Despite having this knowledge, Fill–Rite did not terminate Arnett for nearly two years.  Moreover, during that two year period Fill–Rite paid out all of Arnett's claims without incident, and took no action in the interim to deprive Arnett of any health insurance benefits she received as part of her employment. Nor is there any suggestion that Arnett's use of benefits had increased shortly before her termination.  This long delay suggests that no prohibitive intent was at work in the decision to terminate Arnett.

(internal citation omitted).

Given these facts, combined with the evidence regarding the performance issues that LodgeNet contends comprise the reasons for Corning's termination, Corning fails to

---

[12] There is also no evidence that LodgeNet obtained a reduction in benefits expenses by terminating Corning; in fact, Haar testified that LodgeNet was "unaware of any benefit cost savings resulting from [Corning]'s discharge."  See Clark, 990 F.2d at 1224 ("Hurst has not introduced any evidence demonstrating that . . . Coats & Clark obtained a significant reduction in its benefit expenses.").

show that LodgeNet terminated him with the specific intent to deprive him

of ERISA benefits.  Construing the evidence in the light most favorable to Corning, no

reasonable jury could infer that the prohibited intent was present.  Thus, because Corning

has presented no genuine issue of material fact in support of his ERISA claim, LodgeNet is

entitled to summary judgment on this claim.[13]

Accordingly, it is hereby

**ORDERED**:

1.  Defendant's Motion for Summary Judgment (Doc. 83) is **GRANTED**.

2.   The Clerk is directed to enter judgment in favor of defendant LodgeNet

Interactive Corporation and against plaintiff William H. Corning and close the file.

3.  The Court appreciates the service of Court-appointed pro bono counsel and will

address his request for cost reimbursement shortly.

**DONE AND ORDERED** at Jacksonville, Florida this 14th day of September, 2012.

TIMOTHY J. CORRIGAN
United States District Judge

jk.
Copies:

counsel of record

_____

[13]  Because the Court is granting summary judgment on this basis, it does not reach the exhaustion issue.

29